**In re Donald & Madelaine TAFFI, Debtors.**

**Donald & Madelaine TAFFI, Plaintiffs,**

**v.**

**UNITED STATES of America, and the Franchise Tax Board for the State of California, Defendants.**

Bankruptcy No. LA 91–76720–VZ.
Adv. No. LA 91–07518–VZ.

United States Bankruptcy Court,
C.D. California.

. Aug. 17, 1992.

---

A. Lavar Taylor, Burd & Marshack, Santa Ana, Cal., for debtors.

Lourdes G. Baird, U.S. Atty., Mason C. Lewis, Asst. U.S. Atty., Chief, Tax Div., Michael S. Noble, Sp. Asst. U.S. Atty., Los Angeles, Cal., for U.S.

## OPINION

VINCENT P. ZURZOLO, Bankruptcy Judge.

Donald and Madelaine Taffi (the "Taffis"), plaintiffs in this adversary proceeding and reorganized debtors in this chapter 11 case, seek a judgment dividing the pre-bankruptcy tax claim of creditor and defendant the United States of America and its agency the Internal Revenue Service (the

"IRS") into secured and unsecured claims. The parties have properly presented their dispute to me by cross motions for summary judgment as they have stipulated to most pertinent facts and the remainder are not in dispute.

## I. FACTS

The Taffis owe the IRS $496,940 for tax liabilities that arose in 1980 and 1981 (the "IRS Claim"). To secure payment of the IRS Claim, the IRS recorded a notice of federal tax lien on October 12, 1989 (the "Tax Lien"). The Tax Lien attached to the Taffis' personal residence (the "House"). Liens totaling $233,942.38 that encumber the House (the "Senior Liens") are prior in time and right to the Tax Lien.

In addition to the House, the Taffis own personal property worth approximately $10,000 (the "Personal Property"). The Personal Property is encumbered by a lien imposed by the IRS (the "Personal Property Tax Lien").

The House is worth $300,000 if sold to a willing and fully-informed buyer under normal market conditions (the "Fair Market Value"). The transactional costs of such a consensual sale would be $27,000. If, however, the IRS liquidated the House to satisfy its claim, the IRS would recover only $240,000 (the "Liquidation Value").

On May 22, 1991, the Taffis commenced this chapter 11 case by filing a voluntary petition for relief under chapter 11. They initiated this adversary proceeding by filing a complaint on December 30, 1991. After appropriate disclosure, balloting, notice and hearing, I confirmed the Taffis' plan of reorganization (the "Plan") and the clerk of the court entered my order confirming the Plan on February 27, 1992. In the Plan, the Taffis provided for treatment of the secured and unsecured claims of the IRS. Under the Plan, the Tax Lien is to be released when the secured claim of the IRS is satisfied. The IRS made no objection to the Plan and the order confirming the Plan is final and has not been appealed or challenged in any way.

## II. ISSUES PRESENTED

The parties present the following issues:

1. What is the amount of the IRS's allowed secured claim?

This question requires me to choose the appropriate standard of value—Fair Market Value or Liquidation Value. To answer it I must consider *In re Mitchell,* 954 F.2d 557 (9th Cir.1992).

2. Is the Tax Lien void to the extent it corresponds to the unsecured portion of the IRS Claim?

This issue turns on the meaning and effect of 11 U.S.C. § 506(d). The United States Supreme Court has recently construed this subsection of Title 11 of the United States Code (the "Bankruptcy Code") in *Dewsnup v. Timm,* —— U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

The irony inherent in this dispute is that the Taffis urge me to apply the doctrine of *stare decisis* to the first issue and not to the second, while the IRS requests the converse.

## III. DISCUSSION

My decision on these issues turns on the application of the doctrine of *stare decisis.* Before I explain my application of that doctrine to these issues, I will set out my understanding of it.

### A. *STARE DECISIS*

"*Stare decisis* is defined in *Black's Law Dictionary* as meaning 'to abide by, or adhere to, decided cases.' *Black's Law Dictionary* 1406 (6th ed. 1990)." *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 92 Daily Journal D.A.R. 8982, 9012 ("Casey") (opinion of Chief Justice Rehnquist and Justices White, Scalia and Thomas joining, concurring and dissenting in part). The doctrine is not founded on any statute. Rather, it is a judge-created rule grounded in fundamental policies respected by one of our most innovative jurists. For example, Justice Cardozo wrote:

[I]n a system so highly developed as our own, precedents have so covered the ground that they fix the point of departure from which the labor of the judge

begins. Almost invariably, his first step is to examine and compare them. If they are plain and to the point, there may be need of nothing more. *Stare decisis* is at least the every day working rule of our law.

Cardozo, *The Nature of the Judicial Process* 20 (1921).

In *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970) the Court overturned one of its prior decisions by creating a remedy for wrongful death under federal maritime law. Justice Harlan, in writing for the Court, explained the significance of *stare decisis:*

> Very weighty considerations underlie the principle that courts should not lightly overrule past decisions. Among these are the desirability that the law furnish a clear guide for the conduct of individuals, to enable them to plan their affairs with assurance against undue surprise; the importance of furthering fair and expeditious adjudication by eliminating the need to relitigate every relevant proposition in every case; and the necessity of maintaining public faith in the judiciary as a source of impersonal and reasoned judgments.

*Id.* at 402, 90 S.Ct. at 1788.

■ The Court has recently struggled with the application of *stare decisis* in reviewing its own precedents. *See, e.g., Casey; Payne v. Tennessee,* — U.S. —, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), *reh'g denied,* — U.S. —, 112 S.Ct. 28, 115 L.Ed.2d 1110 (1991). It is uncontested, however, that inferior federal courts, including circuit courts of appeal, district courts and bankruptcy courts, are absolutely bound by the decisions of the Court on issues of law. *Jaffree v. Board of School Commissioners,* 459 U.S. 1314, 103 S.Ct. 842, 74 L.Ed.2d 924 (1983) (acting as circuit justice, Justice Powell stayed district court's judgment authorizing prayer in public school in knowing disobedience of prior decisions of the Court). This is true even if in the opinion of the inferior court, the Court has erred, *Id.* at 1315, 103 S.Ct. at 842–43, or the decision of the Court was

summary and not plenary, *Hicks v. Miranda,* 422 U.S. 332, 344, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1975) (district court bound by Court's summary determination that there was no substantial federal question).

■ It is also true that in the absence of a decision of the Court on an issue of law, the decision of a court of appeals is binding on all inferior courts in that circuit. *Zuniga v. United Can Co.,* 812 F.2d 443, 450 (9th Cir.1987). This is so even if a split of opinion exists between the controlling circuit and another circuit court of appeals and the inferior court believes that the controlling circuit court is in error. *Id.* at 450; *Hasbrouck v. Texaco, Inc.,* 663 F.2d 930, 933 (9th Cir.1981), *cert. denied* 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982).

This hierarchical dimension of *stare decisis* is crucial to the efficient operation of the federal judicial system. If this hierarchy is not observed, then the goals expressed by the Court in *Moragne* cannot be accomplished. Second, and equally important, if inferior courts do not adhere to the precedents of the Court and circuit courts of appeals, those inferior courts usurp the role of the appellate courts and ultimately, Congress, which acts as the primary maker of law in our system of government. *U.S. Const.* art. I, § 1.

■ Unfortunately, not all statutes enacted by Congress are precise in their wording and meaning. Federal courts must then construe those statutes. When the Court construes a statute, that construction is final and is deemed to become part of the statute, until or unless it is overturned by Congress. *Gulf, C. & S.F.R. v. Moser,* 275 U.S. 133, 136, 48 S.Ct. 49, 50, 72 L.Ed. 200 (1927). This is especially true when the Court construes a statute affecting rights in real property. *U.S. v. Title Ins. Co.,* 265 U.S. 472, 486, 44 S.Ct. 621, 623, 68 L.Ed. 1110 (1924). With the foregoing principles in mind, I turn to the issues before me.

**B. VALUING THE HOUSE UNDER SECTION 506(a)**

11 U.S.C. § 506(a) provides:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. *Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.*

11 U.S.C. § 506(a) (emphasis added).

■ It would appear from the above-quoted language that the value of a lien creditor's interest in collateral that is property of a bankruptcy estate must be determined after considering two factors: (1) the purpose of the valuation *and* (2) the proposed disposition or use of the property. In *Mitchell,* the Ninth Circuit applied this test to a used car.

The debtors in *Mitchell* proposed a plan in their chapter 13 case. At the hearing on confirmation of the plan, the bankruptcy court was asked to determine how much of the claim held by the creditor with a security interest in the Mitchells' Cadillac was secured. This determination was important because only the secured portion of the undersecured creditor's claim would be paid in full. The unsecured portion would only be paid 10% of its amount. *Mitchell,* 954 F.2d at 559.

The specific valuation choice faced by *Mitchell* court was whether the Cadillac should be given a wholesale value or a retail value for the purpose of treating the creditor's claim in the Mitchells' chapter 13 plan. The *Mitchell* court concluded that the language in 11 U.S.C. § 506(a) requiring the court to value the "creditor's interest," rather than the debtor's or the estate's interest, mandated the wholesale valuation. This is because the wholesale valuation more accurately approximated "what the creditor would obtain if the creditor were to make a reasonable disposition of the collateral." *Id.* at 560.

The Ninth Circuit placed heavy emphasis on the words "creditor's interest," and essentially ignored the language in Section 506(a) that requires that the valuation of collateral be made in light of the proposed disposition or use of the collateral. As Judge Noonan emphasized in his dissent to the majority opinion in *Mitchell,* "The key fact is that the debtor is going to *use* the car." *Id.* at 561 (Noonan, J., dissenting). The valuation was not being made in the context of a plan in which the debtor or the creditor would liquidate the collateral. In that context, the wholesale valuation would be appropriate in light of *both* requirements of 11 U.S.C. § 506(a).

The *Mitchell* court recognized that the use of wholesale value in determinations under 11 U.S.C. § 506(a) is not universal. The court concluded that if "the collateral is being used as part of a going concern and the prospects for a successful reorganization are good" then the "retail" or "going concern" value would be appropriate. *Id.* at 560.

■ The conclusions of law made by the *Mitchell* court are binding on me pursuant to the doctrine of *stare decisis. Stare decisis* can be difficult to apply, however, when the facts considered by the appellate court are substantially different than those in the pending dispute. It is then the task of the trial judge to determine, with all the intellectual honesty that can be mustered, if the appellate court's reasoning is pertinent and thus controlling.

■ In this case I am not asked to value a used car. Rather, I must decide the value of a personal residence, the House. Houses are not sold on a wholesale basis. Nor is there a true "retail" value for a house. Thus the polarity of value considered in *Mitchell* does not exist here. Nevertheless, the parties in this adversary proceeding have agreed that the IRS would realize only $240,000 if it sold the House at a forced tax sale, the *only* reasonable disposition that the IRS as a creditor can make of the House.

As the debtors in *Mitchell,* the Taffis intend to *use* the House. In this case, the

Taffis intend to use the House as their personal residence and not as an income-generating property. Thus the instance in which fair market value is appropriate according to *Mitchell,* i.e. the collateral is being used as part of a going concern, does not apply in this case.

■ The IRS argues that *Mitchell* is distinguishable because it concerns personal property and not real property. There is nothing in *Mitchell* that limits its application to personal property. The IRS also urges me to give appropriate emphasis to the requirement in Section 506(a) that the valuation of the creditor's interest in the collateral be determined in light of the proposed disposition or use. As the Plan does not propose a liquidation of the House, the IRS reasons that the Fair Market Value controls. The *Mitchell* court rejected essentially the same argument when it was made by the creditor with a security interest in the Mitchells' Cadillac. The Ninth Circuit has apparently decided that unless the proposed disposition or use of the collateral is part of a going concern and the prospects for successful reorganization are good, the appropriate standard of valuation is what the creditor is likely to get in a reasonable disposition of its collateral. *Id.* at 560.

I conclude that in *Mitchell* the Ninth Circuit has construed statutory language to have a particular meaning. It would be disingenuous and contrary to the principles underlying *stare decisis* to determine that the *language* of 11 U.S.C. § 506(a) means something different when the collateral at issue is real and not personal property. This is so even when the *Mitchell* court's interpretation appears faulty on the facts and in view of the plain language of 11 U.S.C. § 506(a).

Based upon the forgoing, the IRS has an allowed secured claim in an amount equal to the value of the House plus the Personal Property ($240,000 + $10,000 = $250,000) less the Senior Liens ($233,942.38) for a total of $16,058.62 (the "Secured IRS Claim"). This means that under 11 U.S.C. § 506(a), the IRS has an allowed unsecured claim in the amount of $480,881.38 (the "Unsecured IRS Claim").

## C. IS THE UNSECURED PORTION OF THE TAX LIEN VOID?

■ 11 U.S.C. § 506(a) provides in pertinent in part as follows:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.

11 U.S.C. § 506(a).

Subsection (d) of the same section of the Bankruptcy Code provides:

> To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void unless—
>
> (1) such claim was disallowed only under Section 502(b)(5) or 502(e) of this title; or
>
> (2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under Section 501 of this Title.

11 U.S.C. § 506(d).

The exceptions set forth in subparagraphs (1) and (2) of subsection (d) quoted above have no role in this dispute. The plain language of these two subsections of Section 506 leads to only two logical conclusions: (1) the secured IRS Claim is an allowed secured claim within the meaning of Section 506(a); and (2) that portion of the Tax Lien that secures or pertains to the Unsecured IRS Claim is void.[1]

---

1. "Void" is not defined in 11 U.S.C. § 506 or anywhere else in the Bankruptcy Code. 11 U.S.C. § 550 discusses the consequences of the "avoiding" of a transfer under §§ 544, 545, 547, 548, 549, 553(b) and 724(a), but makes no reference to 11 U.S.C. § 506(d). 11 U.S.C. § 551 does provide that a lien rendered void under 506(d) is preserved for benefit of the estate. "Void" is defined in *Black's Law Dictionary* as "null; ineffectual nugatory; having no legal force or binding effect; unable in law to support the purpose for which it was intended. An instrument or transaction which is wholly ineffective, inoperative, and *incapable of rat-*

The preceding construction of Section 506(d) is the same one reached by Justices Scalia and Souter in their opinion dissenting with the majority in *Dewsnup*. *Dewsnup*, —— U.S. at ——–——, 112 S.Ct. at 780–81 (Scalia, J., and Souter, J. dissenting). Many federal judges who have construed Section 506(d) have reached the same conclusion.[2]

But for the majority opinion in *Dewsnup*, the plain language of Section 506(d) would draw me to this conclusion as well.

### D. THE *DEWSNUP* MAJORITY'S CONSTRUCTION OF SECTION 506(d)

The facts in *Dewsnup* are straightforward. The Dewsnups were chapter 7 debtors who owned farmland that was worth less than the amount of debt encumbering it. The Dewsnups filed an adversary proceeding seeking a judgment declaring that the portion of the lien encumbering their farmland that pertained to the unsecured claim of the undersecured creditor was void. *Id.* at 776.

The procedural history is relatively simple as well. The *Dewsnup* trial court denied the debtors' request for relief by concluding that the bifurcation effect of Section 506(a) applied only to property in which the bankruptcy estate had an interest. The *Dewsnup* trial court assumed that the bankruptcy estate no longer had an interest in the farmland. It did not make an express finding of fact that the estate no longer had an interest due to the abandonment of the farmland by the estate to the debtors pursuant to 11 U.S.C. § 554. The United States District Court and the Court of Appeals for the Tenth Circuit each affirmed the conclusion of the *Dewsnup* trial court. *Id.* The Court granted *certiorari* in *Dewsnup* because the decision of the Tenth Circuit Court of Appeals in *Dewsnup* conflicted with the conclusion reached by the Third Circuit Court of Appeals in *Gaglia v. First Federal Savings &*

*Loan Assoc.*, 889 F.2d 1304, 1306–11 (1989). *Dewsnup*, —— U.S. at ——, 112 S.Ct. at 776.

The *Dewsnup* majority begins its analysis by summarizing the conflicting positions of the parties to the appeal. *Id.* —— U.S. at ——, 112 S.Ct. at 776–77. Because the parties to the appeal disagreed in their respective constructions of Section 506(d), the *Dewsnup* majority concludes that there is an ambiguity in the statute. *Id.* —— U.S. at ——, 112 S.Ct. at 777.

Next, the *Dewsnup* majority treats this perceived ambiguity as an invitation to employ the following method of statutory construction: "[G]iven the ambiguity in the text, we are not convinced that Congress intended to depart from the pre-Code rule that liens pass through bankruptcy unaffected." *Id.* —— U.S. at ——, 112 S.Ct. at 778. In other words, if a principle of law was embodied in statute or case law that was in effect prior to the enactment of the Bankruptcy Code, then that principle of law survives the enactment of the Code if: (1) the Code would effect a major change in pre-Code practice; (2) the change was not discussed in the legislative history of the Code; and (3) the Code's language is ambiguous. *Id.* —— U.S. at ——, 112 S.Ct. at 779.

Utilizing this analytical tool, the *Dewsnup* majority states that under pre-Code law, a lien would always pass through bankruptcy unaffected. *Id.* —— U.S. at ——, 112 S.Ct. at 778. The only exception noted by the *Dewsnup* majority to this rule was if the debt secured by the lien was paid in full. *Id.* —— U.S. at ——, 112 S.Ct. at 779. As a result of this pre-Code principle of law and the perceived ambiguity in Section 506(d) of the Bankruptcy Code, the *Dewsnup* majority concludes its analysis by holding that Section 506(d) means that a lien is void only to the extent that the claim it secures is disallowed under 11 U.S.C. § 502. *Id.* The *Dewsnup* majority also holds that a lien is *not* void to the extent it

---

ification and which thus has no force or effect so that nothing can cure it." *Black's Law Dictionary* 1573 (5th ed. 1990).

**2.** *See,* M. Howard, *Stripping Down Liens: § 506(d) and the Theory of Bankruptcy,* 65 Am. Bankr.L.J. 373, 374, n. 2 (1991).

secures a claim that is unsecured within the meaning of Section 506(a). *Id.*

The *Dewsnup* majority was anything but firm in its conclusion. In fact, the *Dewsnup* majority did everything but apologize for its holding. In one part of the opinion, the majority states "[H]ypothetical applications that come to mind and those advanced at oral argument illustrate the difficulty of interpreting the statute in a single opinion that would apply to all possible fact situations. We therefore focus upon the case before us and allow other facts to await their legal resolution on another day." *Id.* — U.S. at ——, 112 S.Ct. at 778. In the next paragraph of its opinion the *Dewsnup* majority continues its apologia: "Were we writing on a clean slate, we might be inclined to agree with petitioner that the words 'allowed secured claim' must take the same meaning in Section 506(d) as in Section 506(a)." *Id.* Considering that the Court was construing a statute that had created a conflict between two circuit courts of appeal and stirred controversy among courts and commentators for years,[3] *Dewsnup* is not the definitive pronouncement one would expect from the Court.

## IV. PROBLEMS WITH *DEWSNUP* ANALYSIS

### 1. *No ambiguity in statutory language.*

I cannot find any ambiguity in the language of § 506(d). In his dissenting opinion, Justice Scalia cannot find any either. There is no point to repeating Justice Scalia's analysis and I defer to it. *Id.* — U.S. at ——, 112 S.Ct. at 780 *et seq.* (Scalia, J., and Souter, J., dissenting.)

It is valuable to emphasize two points. There is no apparent ambiguity in the language of the statute. The only ambiguity one could reasonably find is that created by the legislative history to Section 506(d). Legislative history, of course, should not be consulted if the language of the statute is plain. *U.S. v. Ron Pair Enterprises*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103

L.Ed.2d 290 (1989). Second, the term "allowed secured claim" is found in both Section 506(a) and Section 506(d). The *Dewsnup* majority construed Section 506(d) so that the term has a different meaning than that found in Section 506(a). By assigning a different meaning to a term in one section of a statute than that given to other sections of the statute the *Dewsnup* court made it difficult for courts to construe the Bankruptcy Code in a consistent and rational manner.

### 2. *Even if Section 506(d) were ambiguous, pre-Code bankruptcy law was not as it is described by the Dewsnup majority.*

Assuming that the *Dewsnup* majority was correct in concluding that the language of Section 506(d) is ambiguous, it nevertheless erred in its recitation of pre-Code bankruptcy law regarding the stripping of a creditor's lien.

On — U.S. at page ——, 112 S.Ct. at page 779 of *Dewsnup*, the Court summarizes pre-Code bankruptcy law as follows:

Apart from reorganization proceedings, ... no provision of the pre-Code statute permitted involuntary reduction of the amount of a creditor's lien for any reason other than payment on the debt. Our cases reveal the Court's concern about this. In *Long v. Bullard*, 117 U.S. 617, 620–621, 6 S.Ct. 917, 918, 29 L.Ed. 1004 (1886), the Court held that a discharge in bankruptcy does not release real estate of the debtor from the lien of a mortgage created by him before the bankruptcy. And in *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935), the Court considered additions to the Bankruptcy Act effected by the Frazier–Lemke Act, 48 Stat. 1289 (1934). There the Court noted that the latter Act's 'avowed object is to take from the mortgagee rights in the specific property held as security; and to that end 'to scale down the indebtedness' to the present value of the property.' *Id.* at 594, 55 S.Ct. at 865.

---

3. Howard, *supra,* at 373–75.

The Court invalidated that statute under the Takings Clause. It further observed: 'no instance has been found, except under the Frazier–Lemke Act, of either a statute or decision compelling the mortgagee to relinquish the property to the mortgagor free of the lien unless the debt was paid in full.' *Id.* at 579, 55 S.Ct. at 858.

*Dewsnup,* —— U.S. at ——, 112 S.Ct. at 779.

The Court in *Long* did not conclude that under pre-Code law, a lien could not be involuntarily reduced for reasons other than payment on a debt. Rather, the Court in *Long* concluded that the discharge granted in bankruptcy only extinguishes the debtor's personal liability for the debt. It does not release collateral subject to a lien securing the debt that is discharged. *In re Pence,* 905 F.2d 1107, 1109 (7th Cir. 1990); Howard, *Dewsnupping the Bankruptcy Code,* 1 Journal of Bankruptcy Law and Practice 513, 524–30.

The *Dewsnup* court's discussion of the constitutionality of the Frazier–Lemke Act is also inaccurate, or at least incomplete. The Court's decision in *Radford* invalidated a statute that *retroactively* impacted on lienholder's rights by allowing debtors to purchase property by making deferred payments that totalled less than the present value of the collateral. *Radford,* 295 U.S. at 591–93, 55 S.Ct. at 864–65; Howard, *Dewsnupping the Bankruptcy Code supra,* at 524–25. It was the retroactive nature of the statute that made it unconstitutional. Once the Frazier–Lemke Act had been revised to provide the lienholder with payments equal to the full value of the collateral and to only apply prospectively, its constitutionality was upheld. *Wright v. Vinton Branch of the Mountain Trust Bank,* 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937).

In light of the foregoing, it does not appear that the *Dewsnup* court was correct in its conclusion that pre-Code bankruptcy law prohibited the involuntary reduction of a creditor's lien by paying a creditor the present value of the secured portion of its claim.

### E. APPLICATION OF *DEWSNUP* TO THE TAX LIEN

Based upon the foregoing analysis, I disagree with the *Dewsnup* majority's construction of 11 U.S.C. § 506(d). Nevertheless, *stare decisis* binds me to the *Dewsnup* majority's conclusion of law. A judge seeking to avoid the *stare decisis* effect of *Dewsnup* could ask the question, "Can the holding in *Dewsnup* be distinguished because the facts in *Dewsnup* are different from the facts in the present dispute?"

The Taffis have argued that the *Dewsnup* construction of 11 U.S.C. § 506(d) should be limited to those cases in which a chapter 7 debtor seeks to render void an unsecured lien. This argument is supported by the very language of the *Dewsnup* majority: "Hypothetical applications that come to mind and those advanced at oral argument illustrate the difficult of interpreting the statute in a single opinion that would apply to all possible fact situations. We therefore focus upon the case before us and allow other facts to await their legal resolution on another day." *Dewsnup,* —— U.S. at ——, 112 S.Ct. at 778.

This argument would be persuasive if 11 U.S.C. § 506(d) were enacted as part of chapter 7 of the Bankruptcy Code. 11 U.S.C. § 103(b), (c) and (d). The subsection in question, however, was enacted as part of chapter 5 of the Bankruptcy Code. 11 U.S.C. § 103(a) provides: "Except as provided in Section 1161 of this Title, chapters 1, 3, and 5 of this Title apply in a case under chapter 7, 11, 12 or 13 of this Title." Section 1161 does not apply to 11 U.S.C. § 506(d).

Despite the above quoted qualification of the *Dewsnup* majority, the Court did not just apply a statute to a particular set of facts. It construed the meaning of a statute that applies in cases under many chapters of the Bankruptcy Code. Thus, that construction must be applied to all disputes arising under chapters 7, 11, 12, and 13.

One court has concluded that *Dewsnup* does not apply in chapter 11. *In re Butler,* 139 B.R. 258 (Bnkr.E.D.Okla.1992). The *Butler* court based its reasoning on the statement in *Dewsnup* that "[A]part from

reorganization proceedings, ... no provision of the pre-Code statute permitted involuntary reduction of the amount of a creditor's lien for any reason other than payment on a debt." *Dewsnup*, —— U.S. at ——, 112 S.Ct. at 779. The *Butler* court also made reference to the *Dewsnup* language proportedly limiting its holding to the facts before it. *Butler*, 139 B.R. at 258. The *Butler* court goes on to conclude that it is therefore appropriate to limit the holding of *Dewsnup* to chapter 7 cases and to do otherwise would "gut the sum and substance of the reorganization and rehabilitation of debt concept under the Bankruptcy Code." *Id.* Finally, the *Butler* court states the dissenting opinion in *Dewsnup* is compelling. *Id.*

Although I prefer the result in *Butler* to that in *Dewsnup*, I do not believe I have the discretion to choose. I find the reasoning in *Butler* unpersuasive for the reasons stated above,—the Court construed a statute that applies in all chapters. The language quoted by *Butler* concerns the Court's rationale for *why* it chose the construction of 506(d) that it did. Nowhere in *Dewsnup* can I find the conclusion that 506(d) means one thing in chapter 11 and another in chapter 7. It should also be noted that to construe a section of chapter 5 of the Bankruptcy Code to have a different meaning in chapter 7 than it has in chapter 11 would involve the same faulty statutory analysis engaged in by the *Dewsnup* majority and criticized in the *Dewsnup* dissent. *Dewsnup*, —— U.S. at ——–——, 112 S.Ct. at 780–81.

I conclude that *stare decisis* requires me to apply the *Dewsnup* court's construction of 11 U.S.C. § 506(d) even though I find it to be in error. As a result, the Tax Lien is not void to the extent its secures the Unsecured IRS Claim.

### F. *DEWSNUP*, 506(d) AND THE PLAN

■ The Taffis argue that if I do not conclude that 11 U.S.C. § 506(d) renders the tax lien void on its own, the tax lien is nonetheless void through operation of the Plan. The argument is premised on the provision of the Plan that provides that the IRS shall release the Tax Lien upon satisfaction of the Secured IRS Claim. Thus, the Taffis conclude that the Tax Lien should be void to the extent it secures the Unsecured IRS Claim pursuant to the Plan. Otherwise, it is argued, the election embodied in 11 U.S.C. § 1111(b),[4] which was not utilized by IRS in this case, would be meaningless.

I disagree. The Taffis' argument is premised on the failure to distinguish between a lien that is rendered void and a lien that must be released because the claim underlying it is satisfied. If I could apply 11 U.S.C. § 506(d) as Congress wrote it, the Tax Lien would be void to the extent it pertained to the Unsecured IRS Claim. This would be true with or without confirmation of the Plan. This is because there is no such qualification or requirement in 11 U.S.C. § 506(d). This result is barred, however, by *Dewsnup*.

Nothing in *Dewsnup*, however, bars a chapter 11, 12, or 13 plan proponent from dividing an undersecured claim into separate secured and unsecured claims under

---

**4.** Section 1111. Claims and interests.

(b)(1)(A) A claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse, unless—

(i) the class of which such claim is a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or

(ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.

(B) A class of claims may not elect application of paragraph (2) of this subsection if—

(i) the interest on account of such claims in such property is of inconsequential value; or

(ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.

(2) If such an election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed.

Section 506(a). Assuming the plan meets all other requirements for confirmation set forth in the respective chapters of the Bankruptcy Code, the proponent could satisfy the separate secured and unsecured claims through confirmation of a plan and, most importantly, through *consummation* of a plan. If the proponent completes the treatment proposed by the plan and satisfies the secured and unsecured claims of the undersecured creditor then the lienholder would be required under non-bankruptcy law to release the lien from the property of the reorganized debtor. *See,* e.g., 26 U.S.C. § 6325 [5].

This is exactly the conclusion reached by the Second Circuit in *In re Bellamy,* 962 F.2d 176 (2d Cir.1992). In *Bellamy,* the undersecured creditor argued that the decision in *Dewsnup* barred the chapter 13 debtor from dividing the creditor's claim into secured and unsecured claims under 11 U.S.C. § 506(a) and treating them differently through a plan, i.e., the secured claim would be paid 100 cents on the dollar and the unsecured claim would only receive 10 cents on the dollar. The Second Circuit Court of Appeals concluded that nothing in *Dewsnup* barred the debtors from bifurcating the undersecured creditor's claim under Section 506(a) and then treating and satisfying the resulting secured and unsecured claims through the debtor's chapter 13 plan.

In this case, the Plan provides for separate treatments of the Secured IRS Claim and the Unsecured IRS Claim. The Secured IRS Claim will be paid in full and the Unsecured IRS Claim will be satisfied by payment of a fraction of its amount. The IRS did not object to this treatment and has not challenged the Plan or the order confirming it.

This result is consistent with 11 U.S.C. §§ 506(a) and 1111(b). If the IRS wanted the Unsecured IRS Claim to be treated the same as the Secured IRS Claim, it only needed to make its election under 11 U.S.C.

§ 1111(b). Then the Taffis would have been required to pay the Unsecured IRS Claim in full to obtain a release of the Tax Lien through the Plan. Thus there is nothing in *Dewsnup* that prevents the Taffis from confirming and consummating the Plan, and specifically satisfying of the Secured IRS Claim and the Unsecured IRS Claim and obtaining the eventual release of the Tax Lien.

## V. CONCLUSION

Based upon the foregoing, summary judgment is granted in favor of the Taffis in that the valuation of the House is controlled by *Mitchell.* Summary judgment is granted in favor of the IRS in that the decision in *Dewsnup* means that the Tax Lien is not void simply because the IRS is undersecured. The foregoing constitutes my findings of fact and conclusions of law. The prevailing parties shall lodge proposed judgments consistent with the foregoing.

---

5. Release of lien or discharge of property
(a) Release of lien.—Subject to such regulations as the Secretary or his delegate may prescribe, the Secretary or his delegate may issue a certificate of release of any lien imposed with respect to any internal revenue tax if—

(1) Liability satisfied or unenforceable.—The Secretary or his delegate finds that the liability for the amount assessed, together with all interest in respect thereof, has been fully satisfied or has become legally unenforceable.