**In re Mohammed S. BARAKAT, Debtor and Debtor-in-Possession.**

**The LIFE INSURANCE COMPANY OF VIRGINIA, Movant,**

**v.**

**Mohammed S. BARAKAT, Respondent.**

**Bankruptcy No. LA 93–47514–GM.**
**Ref. No. LA 93–02964–GM.**

United States Bankruptcy Court,
C.D. California.

Sept. 26, 1994.

---

Jeffrey I. Golden and Jennifer Ann Golison, Buchalter, Nemer, Fields & Younger, Newport Beach, CA, for Life Ins. of Virginia.

Mark T. Young and Marc A. Lieberman, Mayer, Glassman & Gaines, Los Angeles, CA, for debtor Mohammed Samih Barakat.

## MEMORANDUM OF OPINION ON MOTIONS FOR CONDITIONAL APPROVAL OF DISCLOSURE STATEMENT AND FOR RELIEF FROM THE AUTOMATIC STAY

GERALDINE MUND, Bankruptcy Judge.

Mohammed S. Barakat filed bankruptcy on October 22, 1993, principally to protect his apartment building from foreclosure by Life Insurance of Virginia ("LIV"), which is an undersecured creditor. The LIV note, made by the debtor and four relatives, was all due on September 1, 1989; however, it appears that it was extended from year to year. In June 1993, the remaining relatives conveyed title to this property to the debtor and his wife, and the debtor immediately defaulted on his payments to LIV. Settlement discussions took place between Barakat and LIV, but when no agreement was reached, LIV filed a complaint for judicial foreclosure and sought the appointment of a receiver. On the eve of the receivership hearing, the debtor filed this chapter 11 proceeding.

On November 17, 1993, LIV filed its motion for relief from the automatic stay. At the hearing, the Court granted adequate protection, allowing LIV to proceed with the non-judicial foreclosure action, but not to appoint a receiver. The motion for relief from stay was then continued to February 22, 1994, which was the date the Court had scheduled for a hearing to conditionally approve a disclosure statement. Thereafter, the LIV motion for relief from stay moved forward simultaneously with the hearing for conditional approval of the disclosure statement so that the Court could determine whether this property was necessary to an effective reorganization under 11 U.S.C. § 362(d)(2).

The proposed plan went through several revisions. At first, the process was delayed, because Barakat's original attorney lost his office in the Northridge earthquake. Later, however, Barakat obtained new counsel, who prepared an extensive and well thought out disclosure statement.

The plan creates seven classes, all of which are impaired: the secured claim of LIV in the amount of $3,970,000 and six unsecured classes. Two of the unsecured classes comprise the tenant security deposits for 51 tenants ($29,960 in priority claims of up to $900 per tenant and $3,805 in non-priority claims for 18 of those tenants). Thirteen trade creditors who will continue to do business with the debtor form a class in the total amount of $20,434. Insiders form another class in the amount of $29,516.31. Ten general unsecured creditors form a class in the

amount of $21,616.22. And the LIV deficiency claim of $570,088.36 is separately classified.

There are only two non-exempt assets. One is the 83 unit apartment building valued at $3,970,000. The other is $95,360.72 which was accumulated during the pendency of the case, due to the fact that the debtor has collected rents but has not made any mortgage payments.

The Court reviewed the disclosure statement and noted certain major problems. The first issue was that there was no justification for separately classifying ongoing trade creditors from other general unsecured creditors in that this is an apartment building and not the type of business that must rely on its suppliers.

The Court then determined that the LIV deficiency claim must be part of the general unsecured class, and, therefore, confirmation would require that the general unsecured creditors be crammed down under 11 U.S.C. § 1129(b), since LIV would dominate that class and would likely vote to reject. *See* § 1129(a)(8). The Court further found that security deposit creditors were artificially impaired. Since no impaired class (other than that of the insiders) existed except for the one dominated by LIV, there would be no consenting class without LIV's approval and the plan could not be confirmed under 11 U.S.C. § 1129(a)(10). The Court further found that even if the classification of LIV was proper, the debtor was only contributing "sweat equity" and, therefore, the plan would not meet the absolute priority rule. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); *In re Bonner Mall Partnership*, 2 F.3d 899 (9th Cir.1993), *cert. granted,* ___ U.S. ___, 114 S.Ct. 681, 126 L.Ed.2d 648 (1994).

The matter was continued for the debtor to amend his proposed disclosure statement to deal with these problems. On August 9, 1994, the Court reviewed the new proposed disclosure statement and found that the only substantive change was that debtor's relatives would now be contributing $50,000 in cash as "new value." After oral argument, the Court made findings on the record and granted LIV relief from stay.

As the Court fully believes that this matter will and should be appealed, the Court delayed any foreclosure sale to allow the debtor to seek a stay pending appeal. That motion was granted on September 1, 1994, with the stay being conditioned on certain payments, management protection and other necessary actions by the debtor.

Although the Court made sufficient oral findings to meet the requirements of the Federal Rules of Bankruptcy, this memorandum reduces them to writing in order to focus the issues of the appeal.

### SEPARATE CLASSIFICATION OF DEFICIENCY CLAIM

One of the recent "hot topics" in bankruptcy law is whether the deficiency claim of the undersecured creditor can (or must) be separately classified from all other unsecured creditors. This generally arises because the undersecured creditor has a deficiency claim which will overwhelm the unsecured creditor class and if the undersecured creditor is not separately classified, there will be no consenting class in compliance with 11 U.S.C. § 1129(a)(10).

The two leading theories that have come out of the circuit courts of appeals are *In the Matter of Woodbrook Assoc.,* 19 F.3d 312 (7th Cir.1994) and *In re Boston Post Road,* 21 F.3d 477 (2nd Cir.1994). These are diametrically opposed opinions. This Judge has struggled with the question and is most convinced by the Seventh Circuit theory that the existence of a right to elect under 11 U.S.C. § 1111(b) means that the undersecured real property creditor has different legal rights from other unsecured creditors and therefore separate classification is required. Very recently, however, in the case of *In re Tucson Self–Storage, Inc.,* 166 B.R. 892 (9th Cir. BAP 1994), the Ninth Circuit Bankruptcy Appellate Panel adopted the reasoning of the Second Circuit in *In re Boston Post Road.* The BAP held that separate classification of the deficiency claim is inappropriate unless there is a business justification for it. No such business justification exists in this case.

If this BAP opinion did not exist, this Court would have followed the dictates of the

Seventh Circuit and approved the separate classification of the LIV deficiency claim. However, this Court believes that it is bound by the decisions of the bankruptcy appellate panel under the rules of stare decisis.

### STARE DECISIS EFFECT OF BAP RULINGS ON BANKRUPTCY COURTS

■ Another much debated issue is the effect of a BAP ruling on the bankruptcy court. No dispositive opinion has yet come down. This Court believes that it is bound by the decisions of the bankruptcy appellate panel. The theory behind this is set forth in the following paragraphs.

When Congress amended the Bankruptcy Code in 1984, it set up the initial appeal from bankruptcy court rulings on a dual track.[1] The appellant can choose to go either to the district court (in which the appeal would be heard by one district judge sitting in an appellate capacity) or to the bankruptcy appellate panel (in which the appeal would be heard by a group of three bankruptcy judges, none of whom came from the district in which the case arose). These two appellate entities sit at the same intermediate appellate level, as there is an appeal of right from either of them to the circuit court of appeals. This is a unique system and has raised many questions about the binding effect of decisions by the BAP and also the effect of decisions by the district court. This discussion is made even more complex, since bankruptcy judges are appointed under Article I of the Constitution, whereas district judges are appointed under Article III. Therefore, an additional issue is created as to whether the BAP decisions (given by a three-judge panel of Article I judges) have any stare decisis effect on an Article III district judge sitting as a bankruptcy judge under the withdrawal of reference procedures and, if so, whether they bind the district judge on non-core as well as in core proceedings.

Although the Article III/Article I debate is interesting and emotional, this Court feels that it is not the central issue. If there were no Article I/Article III dispute, the most logical approach to the dual track appellate process would be to view each appellate option as if it were the only vehicle for review and then to see the effect of the two tracks on each other. Further, it makes sense to first look at the application of each track to cases decided in the bankruptcy court. Therefore, we should ask, "what would be the effect of BAP decisions on bankruptcy judges, if that were the only method of initial appellate review from the bankruptcy court (i.e., if the district court route of appeal did not exist)?" To this Judge, the answer is clear: the BAP has all the qualifications of a stare decisis appellate review and this means that its decisions are binding on any case which could be appealed to it.[2]

■ Stare decisis is a judge-created rule "to abide by, or adhere to, decided cases. Black's Law Dictionary 1406 (6th ed. 1990); *Taffi v. United States (In re Taffi)*, 144 B.R. 105 (Bankr.C.D.Cal.1992), *rev'd on other grounds, In re Taffi*, 1993 WL 558844 (C.D.Cal.1993). The doctrine stems from the common law maxim, "Stare decisis et non quieta movere," which is defined as "Let stand what is decided, and do not disturb what is settled." *Coyne v. Westinghouse Corp. (In re Globe Illumination)*, 149 B.R. 614, 617 (Bankr.C.D.Cal.1993), quoting 1B Jeremy C. Moore et al., *Moore's Federal Practice* ¶ 0.402[1] (2d ed. 1992). For years, well respected jurists, such as Justice Cardozo and the second Justice Harlan, believed in the importance of the policy of stare decisis. They recognized the need to have a starting point from which legal analysis could begin and a way to avoid the repeated litigation of identical issues in different cases. They further believed it was important for the law to provide stability and a clear guide for individual conduct, and for the judiciary to be one in which people could have faith. *In re Taffi*, 144 B.R. at 107–08; *see also* Black's Law Dictionary 1406 (6th Ed.1990).

---

1. Prior to that amendment, the Bankruptcy Act of 1978 included a third option of direct appeal to the circuit court of appeals, if the parties consented.

2. Even though a party can opt out, this does not change the fact that the case *could* be appealed to the BAP.

Today, the judiciary continues to place heavy emphasis on those considerations. In *Payne v. Tennessee,* a criminal case pertaining to the admissibility of Victim Impact Statements in capital cases, the United States Supreme Court overruled two of its previous decisions. Despite the fact that it did so, the court reaffirmed the importance of stare decisis and stated that stare decisis "promotes the evenhanded, predictable, and consistent development of legal principles; fosters reliance on judicial decisions; and contributes to the actual and perceived integrity of the judicial process." *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), *reh'g denied,* 501 U.S. 1277, 112 S.Ct. 28, 115 L.Ed.2d 1110 (1991); *remanded sub nom., Owens v. State,* 1994 WL 112997 (Tenn.Crim.App. Mar. 25, 1994). In fact, one factor in the court's lengthy analysis was that the earlier cases, which had been decided by very narrow margins, had defied consistent application by lower courts. *Id.*

█ Stare decisis maintains a hierarchical dimension which is believed to be crucial to the efficient operation of the judicial system. No one contests that all inferior courts are bound by Supreme Court decisions. When no Supreme Court decision has been issued, the decisions of the court of appeals for a particular circuit are binding on all lower courts within that circuit. *Zuniga v. United Can Co.,* 812 F.2d 443 (9th Cir.1987); *In re Globe Illumination,* 149 B.R. at 617; *In re Taffi,* 144 B.R. at 108. Even if the circuits are split and the lower court disagrees with its own circuit, the lower court still must follow its court of appeals. *Id.*

Long ago, circuits and case loads were small enough so that a particular circuit could convene as a single court and decide all appeals. As caseloads and court sizes increased, however, the circuits established rotating panels made up of three judges from a circuit to do the job.

█ For a multi-panel system to work, it is necessary that all panels within a circuit be bound by the decisions of all other panels within the circuit. The doctrine of stare decisis, therefore, not only binds lower courts within a circuit to a court of appeals decision

from that circuit, but also binds the court of appeals to its own rulings. 2A Fed.Proc. L.Ed. § 3:704 (1994). A decision of a panel on the court of appeals becomes the law of the circuit. One panel on a circuit cannot reverse the decision of another panel of the circuit, even if inclined to do so. *NLRB v. Datapoint Corp.,* 642 F.2d 123, 129 (5th Cir. 1981); *Foss v. U.S.,* 865 F.2d 178, 180 (8th Cir.1989), *reh'g denied* (March 8, 1989). The only times that a panel is exempt from following the decision of another panel within the circuit are (1) if the Supreme Court, in the interim, rendered a contrary opinion which requires modification of an earlier circuit ruling, or (2) if the circuit, sitting en banc, issues a ruling which overrules the prior decision of a panel. *Datapoint,* 642 F.2d at 129.

█ An en banc review of a circuit decision is an opportunity to reconsider a panel's decision. *The Politics of En Banc Review,* 102 Harv.L.Rev. 864 (1989). The principal purpose of en banc review is to establish uniformity within the circuit among all the panels. *Id.* Such a review is an "extraordinary procedure intended to bring to the attention of the entire court an issue of exceptional public importance or a panel decision that allegedly conflicts with precedent of the Supreme Court or the circuit." 2A Fed.Proc. L.Ed. § 3:847. An en banc review will resolve an intra-circuit conflict between two panels. *Id.* This leads to certainty in the application of the law, which is the desired outcome of stare decisis.

Thus, if the initial appeal from the decision of a bankruptcy judge was only to the BAP, the rules of stare decisis would require that BAP decisions bind all bankruptcy courts in the circuit. *In re Proudfoot,* 144 B.R. 876 (9th Cir. BAP 1992); *In re Windmill Farms, Inc.,* 70 B.R. 618 (9th Cir. BAP 1987), *rev'd on other grounds,* 841 F.2d 1467 (9th Cir. 1988). Then the sole question of the authority of the BAP would be whether it is binding on district judges who have withdrawn the reference of a bankruptcy case and are sitting as the trial judge/bankruptcy judge on the case. There would be no credible argu-

ment that bankruptcy judges throughout the circuit are not bound by the BAP's decisions.

### EFFECT OF DISTRICT COURT APPELLATE RULINGS ON BANKRUPTCY JUDGES

However, an alternative appeal to the district court does exist. Therefore, the next question to be discussed is "What would be the effect of appellate decisions by district judges if there were no bankruptcy appellate panel?"[3]

 When an appeal is taken to the district court[4], the judge who determines the appeal is not bound by the appellate decisions of his or her colleagues. An illustration of the nonexistence of any binding effect of a district judge's decision on other judges in the same district is the treatment in the Central District of California of the issue of whether a bankruptcy court may conduct a jury trial. The Ninth Circuit has never ruled on this issue. In *Gumport v. Growth Financial Corp. (In re Transcon Lines)*, 121 B.R. 837 (C.D.Cal.1990), Judge Tevrizian held that there was no authorization for the bankruptcy court to conduct jury trials. The following year, Judge Hupp, a colleague of Judge Tevrizian, came to a different conclusion. In *In re Great American Mfg. and Sales, Inc.*, 129 B.R. 633, 635 (C.D.Cal.1991), Judge Hupp specifically wrote:

"No Ninth Circuit Court of Appeals decision has yet considered whether the bank-

ruptcy court may conduct a jury trial in core matters. Judge Tevrizian of this court examined the issue in *Gumport v. Growth Financial Corp. (In re Transcon Lines)* 121 B.R. 837 (C.D.Cal.1990) and agreed with the reasoning of the Eighth and Tenth Circuits that there was no authority for the Bankruptcy Court to conduct jury trials.... This court reaches the opposite conclusion."

The fact that Judge Hupp was free to make a ruling which was inconsistent to that previously published by Judge Tevrizian clearly demonstrates that one judge of the district court is not bound by the prior decision of another.

 Therefore in a district with more than one district judge, the appellate ruling by a district judge is only binding on the case in which it is made and not on the district as a whole unless the district judges themselves sit en banc and therefore bind themselves to the law enunciated in that opinion.[5] In other words, unless the judges of the district court are willing to accept the concept that they are bound by prior decisions of their colleagues on issues before them, appellate holdings of the judges of the district court are not to be given stare decisis affect, for it is the willingness of the appellate court to create certainty in the law that requires trial courts in their "chain of command" to follow their authority.[6] Since most appellate deci-

---

3. Which is the situation in all circuits except the Ninth Circuit at this time.

4. The discussion of the district court as an appellate authority only concerns core matters or other types of matters where no trial de novo is allowed. If the district is sitting in a matter in which there is a trial de novo, the district court is sitting as a trial court and not as an appellate court. The difference is that the appellate court is limited to review of the record below, whereas the trial court takes fresh evidence.

5. Prior to 1991, bankruptcy judges assumed that they were bound by the appellate decisions of district judges. But since the holding in *In re Gaylor*, 123 B.R. 236 (Bankr.E.D.Mich.1991), there has been a general consensus that decisions of a district judge are not binding on the bankruptcy judges of that same district. For further discussion see Hon. Steven W. Rhodes, *Eight Statutory Causes of Delay and Expense in*

*Chapter 11 Bankruptcy Cases*, 67 Am.Bankr.L.J. 287, 296–297. The Ninth Circuit Bankruptcy Appellate Panel had mentioned in *In re Windmill Farms*, 70 B.R. 618 (9th Cir. BAP 1987), *rev'd on other grounds*, 841 F.2d 1467 (9th Cir.1988), that the bankruptcy judges of a district are bound by the rulings of a district judge in that district. In the 1992 *Proudfoot* opinion, they reiterate that BAP decisions originating in any district of the circuit are binding precedent on all bankruptcy courts in the circuit in the absence of contrary authority from the district court of that district. There is no indication that the *Proudfoot* court revisited their prior ruling as to the authority of district court opinions.

6. As noted above, just because a party can choose the BAP instead of the district court (or the district court instead of the BAP) does not remove the bankruptcy court from those courts who are subject to stare decisis decisions made by each of those appellate entities.

sions of the district court are not decisions of the district court *en banc,* but are decisions of a given district judge and are not binding on other district judges of that district, they should not be seen as binding on the bankruptcy judges of that district. *In re Gaylor,* 123 B.R. 236, 241–43 (Bkrtcy.E.D.Mich.1991).

This Court can find no authority for the proposition that district court appellate decisions are binding on anyone outside that district. The best analogy would be decisions by the various circuits. Those decisions are only binding on courts that are subject to appellate review by that circuit. Since bankruptcy decisions are subject to appellate review by the district court of that district, but not of any other district, they cannot be binding on bankruptcy courts from other districts.

Therefore, this Court believes that if there were no district court appellate review, the rulings of the bankruptcy appellate panel would be binding bankruptcy law on all bankruptcy judges within the circuit. If there were no bankruptcy appellate panel, this Court believes that an appellate decision of a district judge is only the law of the case unless the entire district court accepts the burden of stare decisis and binds itself to that decision.[7]

Although the above analysis is logical, the side-by-side system that exists is cumbersome and does not create the desired certainty of outcome. A trial judge in a bankruptcy case must follow the BAP rulings and yet, if the appeal is to the district court, the district judge could ignore that interpretation of the law in the same way that one circuit court of appeals "respectfully disagrees" with the de-

cision by another circuit court of appeals.[8] So until the court of appeals in that circuit resolves the conflict, litigants never know what the binding interpretation of the law will be.

However, this uncertainty does not justify the added confusion caused by holding that no intermediate appellate authority is binding throughout the circuit. The fact that these two systems reside side-by-side does not change the stare decisis nature of BAP rulings. There is no reason that both the BAP and the district court appellate decisions must have identical affect, authority, or jurisdiction. This Judge believes that it would be improper to shrink the jurisdiction of the bankruptcy appellate panel solely because there is an alternative appellate process through the district court. It is equally incorrect to increase the affect of a district court appellate decision merely because the bankruptcy appellate panel exists. For that reason, this Court believes that it must follow the decision of *In re Tucson Self–Storaqe, Inc.*

### EFFECT OF BAP RULINGS ON A DISTRICT JUDGE SITTING AS A TRIAL JUDGE ON A BANKRUPTCY CASE

For the appellate system to provide the desired certainty of outcome in bankruptcy cases, the initial appellate review should be able to establish circuit-wide law. Unfortunately the hybrid that exists does not meet that goal. Whereas one case can be decided by a bankruptcy judge and then requires an intermediate appeal to the BAP or the district court before it has an appeal of right to the circuit (28 U.S.C. § 158), another case

---

7. If the district court does an en banc opinion which conflicts with a BAP opinion, the bankruptcy judge is free to choose between them, just as if there were conflicting opinions of two panels of the circuit court in which the bankruptcy court sits. *In re Donaldson,* 156 B.R. 51, 54 (Bkrtcy.N.D.Cal.1993) citing *Auto Equity Sales, Inc. v. Superior Court,* 57 Cal.2d 450, 456, 20 Cal.Rptr. 321, 369 P.2d 937 (1962). *Auto Equity Sales* concisely summarizes the doctrine of stare decisis and notes that in conformance with the rules of stare decisis "where there is more than one appellate court decision, and such appellate decisions are in conflict ... the court exercising inferior jurisdiction can and must make a choice

between the conflicting decisions." *Auto Equity Sales,* 57 Cal.2d at 456, 20 Cal.Rptr. 321, 369 P.2d 937.

8. The current case is a fine example of this problem. If this appeal goes to the district court rather than to the BAP, the district judge can ignore *Tucson Self–Storage* and choose to follow the reasoning of *In the Matter of Woodbrook Assoc.* That then becomes the law of this case. Yet next time the same issue arises, I must rule under *Tucson Self Storage* and may be affirmed by a different district judge. Obviously this can lead to inconsistent application of the law.

involving the same issues of law can have the reference withdrawn, be decided by the district judge and then will be subject to immediate appeal to the circuit. *In re Manoa Finance Co.,* 781 F.2d 1370, 1372 (9th Cir. 1986), *cert. denied* by *Yamamoto v. Klenske,* 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997, *reh'g denied,* 480 U.S. 941, 107 S.Ct. 1594, 94 L.Ed.2d 783 (1987). This makes no logical sense and dramatically increases the costs and lengthens the time to final decision for the litigants whose case is decided by the bankruptcy judge. It also leads to more uncertainty since even BAP decisions are not binding on the district judge, since the BAP is not part of the district judge's appellate chain.[9]

Therefore as the law now stands, a bankruptcy case being heard in the bankruptcy court should be decided by the bankruptcy judge in conformance with court of appeals rulings; but absent such decisions, it will be decided in accord with the BAP or the en banc decision of the district court for that district. On the other hand, if the reference is withdrawn, the district judge can ignore the BAP and will only be bound by the court of appeals. Since there are significantly fewer court of appeals bankruptcy decisions in the Ninth Circuit than BAP decisions, wide gaps exist in the areas of settled law.

This is an inefficient and ineffective situation. It is important that bankruptcy law be uniform throughout the country (as required by Article I § 8 of the Constitution), that final decisions be determined expeditiously, and that costs and delays be minimized. I suggest that Congress either create specialized panels of the court of appeals to assure expeditious operation in case processing and uniform laws of bankruptcy[10] or that the BAP be the only appeal of right from core

matters (regardless of whether they are heard by a bankruptcy judge or by a district judge).

The concept of stare decisis should not rest on whether the judges making the appellate determination have limited jurisdiction and limited judicial powers and whether that binds trial court judges of general jurisdiction and expanded judicial powers. Stare decisis came into the law to provide certainty in the application of law to a variety of cases. The work that the district judge does on a core matter in which the reference is withdrawn is work which is fully within the jurisdiction of an Article I bankruptcy judge and therefore it is irrelevant whether the person deciding the matter has Article III status or not. Thus a district judge who is handling core matters should be bound by stare decisis of the intermediate appellate process in the same way that a bankruptcy judge is bound; however, a district judge who is dealing with non-core matters would have these tangential bankruptcy issues decided as part of the non-bankruptcy appellate process from the district court directly to the court of appeals.

## CLASSIFICATION OF TENANT DEPOSITS AND OF TRADE CREDITORS

The debtor has divided the tenants' pre-petition security deposits into two classes: Class 2, consisting of 51 individuals, for the priority claim portion of pre-petition deposits (up to $900 per individual) and Class 4, consisting of 18 claimants, for the non-priority portion of the pre-petition security deposits which are not presently due and owing. With respect to treatment of the claims, Debtor states that the entire amount

---

9. To add even more confusion, there are now several reported cases where the district judge withdrew the reference of a bankruptcy case and then the parties consented to trial of an adversary proceeding before a magistrate judge. Appeal from this core matter determination by a non-Article III judge was directly to the court of appeals. *In re Acequia Inc.,* 34 F.3d 800 (9th Cir.1994); *In the Matter of Toyota of Jefferson, Inc.,* 14 F.3d 1088 (5th Cir.1994). Further, under the theory enunciated in this opinion, the magistrate judge is not bound by any BAP or district court opinion.

10. In the meantime, it would be wise if district judges would give deference to BAP decisions, whether they are sitting as trial judges or as appellate judges. As the BAP said in *In re Windmill Farms,* "We are not bound by the [district court appellate] decision in *In Matter of Escondido West Travelodge* [52 B.R. 376 (S.D.Cal.1985)] but pay great deference to decisions of the district court and as a matter of comity, we should follow such decisions when possible." *In re Windmill Farms,* 70 B.R. at 622.

of the Allowed Class 2 Claims will be deposited into a segregated Priority Tenant Deposit Account on the effective date or as soon thereafter as practicable. As deposits are refundable, the entire amount of the required deposit payment, up to $900 each, will be paid from the account. For Class 4, no payments will be made until they are due under state law, at which time they will be paid from operating funds as an expense. In his disclosure statement, the debtor claims that these are impaired classes. The debtor cites *In re L & J Anaheim Associates*, 995 F.2d 940 (9th Cir.1993) for this proposition.

The Court does not agree with the debtor's position. The tenants have a right to recover their security deposits from the owner of the building at the time that they move out. This right is contingent and unliquidated until the tenant actually moves out and returns an undamaged unit to the owner. Because the plan proposes to pay the claimants in full at that time, the Court is of the opinion that the plan does not affect the rights of the tenants and the Court finds that they are unimpaired.[11] 11 U.S.C. § 1124(1).

■ In addition, even if Classes 2 and 4 were impaired, the Court does not find that these two classes have the kind of interest in the reorganization that Congress intended when it determined that at least one impaired class must vote for the plan.

There is little legislative history available on the purpose of § 1129(a)(10), but what little there is has been summarized in *In re Greystone III Joint Venture*, 102 B.R. 560 (Bkrtcy.W.D.Tex.1989). A few other cases discuss the matter and agree that the point of § 1129(a)(10) is to prevent the bankruptcy court from becoming a dumping ground for two party disputes. The cramdown provisions are not available to any person seeking to refinance his loan. "In short, there must be some one other than the debtor, other than the insiders, and other than the target of the cram down, who cares enough about the reorganization and whose rights must also be considered to invoke the equitable

grounds that justify resort to cram down." *In re Anderson Oaks (Phase I) Limited Partnership*, 77 B.R. 108, 112–13 (Bankr. W.D.Tex.1987).

■ That impaired class must have a genuine interest in the reorganization. In *In re Franklin Mortgage & Investment Co., Inc.*, 143 B.R. 295 (Bkrtcy.D.Dist.Col.1992) the only unsecured creditor was an accounting firm owed $5000. The objecting secured creditor was owed $2,250,000. In deciding that the acceptance of the accountant was not sufficient to meet the requirements of § 1129(a)(10), the court stated, "[t]o allow the accounting firm's claim to serve that purpose would be a true case of the tail wagging the dog." *Id.* at 300 n. 1.

This Court believes that a tenant who has previously given a security deposit is not the kind of creditor who really has an interest in the debtor and in accepting the reorganization proposal. Without a truly interested creditor accepting the plan, a Debtor should not be able to cramdown the principal creditor.

■ As to the trade creditors, this Court finds that there is no business justification for separate classification. Arguably a manufacturer or retailer might need to sweeten the pot for trade creditors in order to get future credit and inventory. But this is an apartment building and the trade creditors of this debtor are for such things as trash collection, pool service, roof repair, etc. In the greater Los Angeles area literally thousands of companies are available to provide these services. Further, the debtor has built up a war chest since he has not been making payments to LIV. If he truly felt that these trade creditors were crucial, there is no reason that he could not pay them in full on the effective date of the plan and then they would not be impaired. In *In re 266 Washington Associates*, 141 B.R. 275, 287 (Bkrtcy. E.D.N.Y.1992), the court found that the trade creditors (owed $26,800) were artificially impaired when the debtor had accumulated

---

11. In *L & J Anaheim*, 995 F.2d 940, the secured creditor was deprived of various contractual rights, including rights to foreclose under state law. These were not de minimis changes to the prepetition bargain of the parties. However the changes suggested by Barakat in his plan in the handling of the security deposits are mere form and not substance.

funds through not paying its mortgage and where the Debtor's partners would likely have access to funds to pay them in full at confirmation.

## CRAMDOWN AND NEW VALUE EXCEPTION

At this point in time the Court has no need to determine whether the debtor could meet the requirements of § 1129(b) so as to cramdown LIV nor whether the $50,000 offer would meet the requirements of the new value exception under *Bonner Mall*, etc. First there has to be a consenting impaired class. As noted in *266 Washington Associates*, "[s]ection 1129(a)(10) operates as a statutory gatekeeper barring access to cram down where there is absent even one impaired class accepting the plan." *Id.* Since there would be no consenting impaired class in this plan, the plan fails prior to having to look at the cramdown analysis.

## GRANTING RELIEF FROM STAY

Because the debtor cannot propose a confirmable plan, the Court finds that the debtor has not met the requirements set forth in *United Sav. Assn. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) that there be a probable reorganization within the foreseeable future. For that reason, the Court declines to conditionally approve [12] the disclosure statement and grants relief from the automatic stay so that LIV can proceed with its foreclosure sale.

12. Shortly after filing, the debtor was ordered to submit a disclosure statement by a date certain so that it could be reviewed by the Court and Office of the United States Trustee. If it were conditionally approved, it would be disseminated to all parties in interest for a combined disclosure statement/confirmation hearing.